Lee **VANDERVELDE**, et al., Plaintiffs,

v.

**PUT AND CALL BROKERS AND DEALERS ASSOCIATION**, Incorporated, et al., Defendants.

**No. 63 Civ. 3470.**

United States District Court,
S. D. New York.

April 14, 1972.

Malcolm A. Hoffmann, New York City, for plaintiff, Edward A. Woolley, Bernard Zucker and David Bender, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Put and Call Brokers and Dealers Assn., Inc., Henry Blair & Co., and Edna Blair, as Executrix of the Estate of Henry Blair, by Isaac Shapiro, Adlai S. Hardin, Jr., and Mark L. Davidson, New York City, of counsel.

Murray Gottesman, New York City, for Anne S. Filer, as Executrix of the Estate of Alvin V. Filer, and others.

Boskey, Boskey & Cole, New York City, for Boris M. Balson, the Executors of the Estate of Herbert Filer, and Filer Schmidt & Co., by Mortimer Cole, New York City, of counsel.

George Dines, New York City, for Lawrence G. Botts and Thomas, Haab & Botts.

Paskus, Gordon & Hyman, New York City, for Godnick & Son, Inc. by Philip H. Schaeffer, New York City, of counsel.

Bennett, Kaye & Scholly by James D. Bennett, Rockville Centre, N. Y., for

Melanie Haab, as Executrix of the Estate of Philip D. Haab.

Raphael P. Koenig, New York City, for Mildred Linburn, as Executrix of the Estate of Richard E. Linburn.

## FINDINGS AND OPINION

POLLACK, District Judge.

*Preliminary*

This is a private antitrust action brought against the Put and Call Brokers and Dealers Association (the Association), a New York membership corporation, by one of its former members and the two wholly-owned corporations through which he conducted business. The complaint alleges that the Association unlawfully suspended Lee Vandervelde from membership, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and that the suspension caused the termination of the business of the two corporate plaintiffs. The Court's jurisdiction is based on § 4 of the Clayton Act, 15 U.S.C. § 15.

Lee Vandervelde became a member of the Association in October, 1959. He was the President and sole shareholder of the corporate plaintiffs, L. Vandervelde & Co., Inc., a California corporation organized in 1959, and L. Vandervelde New York Corp., a New York corporation organized in 1961. The companies acted as dealers in and writers of puts and calls from November 1, 1959 and November, 1961, respectively, until early November, 1963. For convenience, Vandervelde and his enterprises will hereafter be referred to simply as "Vandervelde" unless otherwise indicated.

The corporate plaintiffs seek damages for loss of income and the termination of their business activities and Vandervelde himself seeks to recover for loss of salary as an employee of the corporate plaintiffs.

The defendants herein, in addition to the defendant Association, are 13 of its members and 8 put and call firms associated with Association members.[1]

The plaintiffs also named as defendants six member firms of the New York Stock Exchange. The Court dismissed the action against these defendants at the close of the trial.[2]

*Summary Statement of the Action*

On August 27, 1963, Lee Vandervelde and Donald Cohen, the manager of Vandervelde's New York office, were each suspended from the Association for their failure to pay $125 fines levied on each of them by the Association's Board of Directors, upon recommendation by its Committee on Business Conduct. Two months earlier, the same Committee had ruled that Vandervelde and Cohen had engaged in improper business conduct by informing another put and call member firm that an option advertised by Vandervelde was no longer available for sale, which was untrue, and further that Vandervelde had refused in violation of an Association rule, to grant a discount or allowance to a co-member of the Association who desired to purchase an advertised option from Vandervelde. The Committee also found that Vandervelde unfairly discriminated against co-members of the Association by granting discounts to stock brokerage firms upon sale to or through them of advertised options, by accepting discounts from Association members, but refusing to grant discounts to other members.

Plaintiffs contend that the discount rule of the Association, among others, is invalid as a restraint upon competition among option dealers, prohibited by

---

1. During the trial of the action, the complaint was dismissed by stipulation of counsel as to Julius Brasz, Edward Daly, Joseph Ezra, William Freiman, Samuel Gomperg, the Estate of L. P. Kahn, Paul Karp, Henry G. Vogel, Joseph Ezra & Co., Vogel-Lorber, Inc. and A. A. Feder. Prior to the trial, Col. Homer E. Miller and his firm were dismissed from the action.

2. 1971 Trade Cas. (CCH) ¶ 73,728 (S.D. N.Y.1971).

§ 1 of the Sherman Act, and that the suspension constituted an unlawful boycott of their business by the Association, also void under § 1. They make the additional claim that the suspension and ensuing boycott were part of an attempt by the Association and its members to monopolize trade in options, prohibited by § 2 of the Act. The suspension is claimed to have resulted in the loss of business from the six stock exchange firms mentioned above, depriving Vandervelde of his major source of options and customers, and rendering continuation of profitable operations impossible.

The defendants contend that none of the rules of the Association which plaintiffs cite in their allegations is unlawful and that the suspension was a justified instance of a trade association's acting to insure the ethical conduct of its members. Moreover, they contend that issues of antitrust liability need not ever be reached in this action because the facts demonstrate that the business had previously lost significant amounts of its capital and was worthless as a going concern at the time of the suspension and that the termination of the Vandervelde business was a voluntary one prompted by economic failure.

The resolution of the controversy between the parties requires a preliminary understanding of the nature of the option business and the organization and activities of the Association.

*Put and Call Options*

Put and call options are negotiable contracts in which the writer of the option, for a certain sum of money called the "premium", gives the buyer of the option the right to demand within a specified time the purchase or sale by the writer of a specified number of shares of a stock at a fixed price called the "contract price". A "put" gives the purchaser an option to sell, and commits the writer to buy, the shares covered by the option; a "call" gives the purchaser an option to buy, and commits the writer to sell, the subject shares.[3] Options are always written in 100 share units.

The put and call broker-dealer firms are the intermediaries through whom trading in options is carried on. A person who wishes to sell or to purchase an option will utilize an option dealer to create the trade he seeks.[4]

In June, 1959, the Securities and Exchange Commission conducted a statistical survey of the option business and ascertained that there were two types of option firms; those which performed only a brokerage function and those which traded in options, purchasing options from writers for inventory in the hope of arranging a later, profitable sale. Securities and Exchange Commission, Report on Put and Call Options 69 (1961) (hereinafter cited as SEC 1961 Report). The SEC found that the ten firms which acted solely as intermediaries for specific trades between buyers and sellers dealt almost exclusively through New York Stock Exchange member firms. SEC 1961 Report at 69.

The report further showed that the great majority of options are written by persons who are not dealers in puts and calls, and that the put and call firms wrote less than 6.3% of the options outstanding at the time. SEC 1961 Report

---

3. The contract price is generally the market price of the stock at the time the option is purchased. For options exercisable at the market, the premium paid varies depending on the stock, the type of market and the length of the contract. Options are generally written for periods of 30, 60 or 90 days or for 6 months.

In addition to put and call options, dealing may occur in straddles (a combination of a put and a call on the same security at the same price), strips (two puts and one call on the same security) and straps (two calls and one put).

4. In the case of a "cross", an option transaction in which both the writer and purchaser of the option are customers of the same stock brokerage house and the trade is arranged by that house internally, the put and call dealer's function is merely to supply the option paper necessary to complete the trade, in return for which a small commission is paid the firm.

at 56, 55. It is not necessary to be a put and call dealer in order to write options.

Dealing in put and call options is a highly speculative and volatile sector of the securities industry. These options have several potential uses for buyers [5] and present an opportunity for profit for option writers who feel that their judgment about the future course of activity in a security is correct. For both parties, the key factor on which an option trade is based is a competing prediction of market movement in a given security during a given period of time. However, the fact that an option's desirability is based on the fluctuation of stock prices creates a potential incentive for market manipulation and unscrupulous treatment of prospective option buyers. It was to prevent the development of such practices that self-regulation of the option business by the Association was initiated.

*The Association of Dealers*

The Association is composed entirely of individuals engaged in the put and call business. Any person may become a member of the Association if approved by the Board of Directors. The Board, with the assistance of the Committee on Admissions, considers the character and reputation of the applicant and also the applicant's knowledge of the put and call business and an affirmative vote of two-thirds of the Board is required for acceptance as a member. A corporation conducting a put and call business may have the benefit of the use of a membership held by an executive officer of such corporation and such firms are considered associated members.[6]

The Association was formed in August, 1934. The impetus for its creation was provided by congressional hearings, prior to passage of the Securities Exchange Act, which contemplated abolition of all option trading.[7] After passage of the Exchange Act in 1934, which accepted regulation of option trading, 15 U.S.C. § 78i(b) (1971), as a substitute for prohibition of such trading altogether, the Association was formally organized. Fifty-five individuals became members of the Association at its first meeting. At the time Vandervelde joined the Association in 1959 there were 30 members, representing a somewhat smaller number of active put and call firms, and there are presently 30 members.

The purposes of the Association are:

To foster the maintenance of high standards of integrity and honor in all business dealings by its members; to prevent any trade practices which may be or may tend to be unfair or inequitable; to establish trade practices which are conducive to harmonious relations among its members and to efficiency in the conduct of their business, and thus to enable them to better serve the persons with whom they deal, or on whose behalf they act; and to provide for the settlement by arbitration of all differences and disputes arising between members, and otherwise to promote their welfare.

Constitution and By-Laws of the Put and Call Brokers and Dealers Association, Inc., Art. II. (hereinafter cited as "Constitution").

The SEC's Special Study of the Securities Markets, described the Associa-

---

5. Options may be utilized to provide a sort of insurance against market movements in existing or prospective security positions by the option holder. However, the SEC found that the primary attractiveness of options to purchasers lay in the opportunity provided for "speculation on a small amount of capital." SEC 1961 Report at 77.

6. Memberships may be purchased from inactive members and reissued by the Association to new members, or members

wishing to leave the organization may transfer their membership directly to new members with the Association's approval, upon payment of an initiation fee by the new member. The latter course is apparently the more usual, perhaps because the Constitution sets the price for a new membership at $25,000., a price in excess of the cost of obtaining an existing membership during the period in question.

7. See 3 L. Loss, Securities Regulation 1544 (1961).

tion as "the most highly organized" of all the unofficial self-regulatory agencies in the securities industry. The Study continued: "In many respects the association is as highly institutionalized as an exchange and the business in which its members engage is as strictly controlled as are dealings in listed securities. . . . Although the PCBDA has no official standing, the association has assumed as firm control over its members and the put and call market as certain official self-regulatory bodies have over their members and members' activities." See 4 Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc.No. 95, 88th Cong., 1st Sess. Pt. 4 (1963) at 687, 690 (hereinafter cited as SEC Special Study).[8]

The Association's most important achievement has been adoption of a standard form of option contract and creation of a mechanism by which the obligations of the writer of the option are guaranteed—effectively rendering the option contract a negotiable instrument.

The standard form of option contract specifically sets out the obligations of the writer and endorser of the option and informs the buyer of the precise life of the option he holds and the effect on the price he must pay or the shares he will receive of dividends, warrants, or splits during the option's life. Use of a standardized form contributes greatly to the stability of the option market by eliminating confusion and adding to the protection of the buyer.

The Constitution of the Association states that members are to use only the official form of option obtainable from the Association, and only members may obtain such forms. Each contract contains the legend that it has been issued by a member of the Association and the equally important legend that the option contract is guaranteed by a member of the New York Stock Exchange.

The endorsement of options by the stock brokerage firm of the option writer serves to insure the purchaser that the contract will be fulfilled if he chooses to exercise his contract right. The availability of this guarantee is felt to strengthen public confidence in option dealings by divorcing the fulfillment of any given contract, if necessary, from the financial ability of the option writer to meet his commitment. Options sold by Association members are required to have the endorsement of New York Stock Exchange member firms.[9] The Board of Directors may designate other exchanges as acceptable endorsers but it has never done so, although it has received inquiries from both the American Stock Exchange and the Toronto Stock Exchange in this regard.[10]

In addition to these basic rules setting the parameters for the writing and selling of options, the Association has adopted a number of rules regulating the business conduct of its members and attempting to establish a set of uniform practices for firms dealing in options.

Some of these rules concern record keeping and creation of usable data on the scope, volume and performance of

8. The Board of Directors of the Association is granted "full power and authority . . . to regulate the dealings and business conduct of the members, and to promote the objects and purposes of the Association, with full authority to make, promulgate and enforce rules, orders and decisions to that end." Constitution, Article IV, § 1.

9. Constitution, Article VIII, § 24. This endorsement policy was recommended by the 1935 staff report of the SEC which was the source of several important Association rules, as discussed below. The

SEC, however, included in its list of potentially acceptable endorsers, "trust companies, insurance companies or other types of approved financial institutions." SEC 1961 Report at 101.

10. In each case the refusal to authorize additional members was based on the fear that members of other exchanges, not subject to the same margin and financial stability requirements as are imposed on members of the NYSE, would be unable to provide equal protection for option purchasers.

the option market; members are required to report their transactions to the Association, a measure recommended by the SEC, and are also required to maintain their own records as to the details of each transaction they handle.

A second set of rules concerns regulation of the terms on which members deal. Thus, no advertisement of any option at a price of less than $137.50 is permitted (it may be sold for less but not advertised for less), and no option may be offered by mail for less than 21 days or less than $100 premium. No option may be written or traded under any circumstances with a life of less than 21 days. As noted earlier, options must be traded in 100 share units, and to the extent that there is still commerce in options based on a "points away from the market" calculation, that option must be sold at the fixed premium of $137.50 per 100 shares. The "discount" rule, which is discussed below, also falls into this category.

A third set of important rules governs the relationship of Association members with other securities firms. Members of the Association may not share commissions or profits with any non-members except those who are registered with the SEC, and the amount of the commission which may be paid is limited to a maximum of $6.25 for each 30-day option of a hundred shares. This rule was another of the recommendations made by the SEC in 1935. When an Association member cashes in a profitable option for a client, he must charge his customer the same commission and tax as would be charged by member firms of the New York Stock Exchange for the sale, transfer or exercise of options.[11]

The Association regulates the methods by which its members seek to bring their operations or specific options to the attention of the public. Members must file any pamphlet, circular, advertisement or other literature with the Association's Committee on Publications, and approval before publication is required in many instances. All such materials must contain the legend that the advertising firm is a member of the Association, and the Constitution states that no matter in any such material "shall contravene the standards of business practices and ethics fostered by the Association." Constitution, Art. V, § 6.

The Association's Committee on Business Conduct is empowered to consider matters relating to the practices of members or their firms and the observance of the Association's rules and regulations for the "fair and equitable transaction of business by members. . . ." Constitution, Art. V, § 4. The Board of Directors is authorized to try charges against members for violation of the Constitution or rules, failure to comply with any order or decision of the Board or a standing committee, or acts "inconsistent with equitable, fair and honorable commercial dealings." Constitution, Art. IV, § 2(f). Penalties include fine, suspension or expulsion.

Under Section 9(b) of the Securities Exchange Act, 15 U.S.C. § 78i(b), the SEC was granted jurisdiction to enact and enforce rules and regulations governing the put and call business and those engaged in the business as brokers

---

11. Mindful of the findings of the congressional committees investigating the securities industry in 1933 and 1934 that the granting of options had been an important element in manipulative activity on the stock exchanges, see 3 L. Loss Securities Regulation 1544, n. 44 (1961), both the Association and the New York Stock Exchange have taken steps to insure the separation of trading in options from transactions in listed securities. An Association member who becomes associated with a stock brokerage house becomes a "dormant member" of the Association, without any of the privileges of membership, for the duration of his connection with the firm. Stock Exchange rules prohibit its members from publicly offering options on the floor or from trading in securities in which their firms or the members thereof hold or have granted any option. In addition, odd-lot dealers and specialists are prohibited from writing or acquiring options on stocks in which they are registered to act. 3 L. Loss, Securities Regulation 1545, n. 49 (1961).

**130**

and dealers.[12] Although recommended in 1935 by its staff, the SEC has never enacted any such rules, but it has followed the business closely and has conducted investigations and written reports relating to the commerce in puts and calls in 1934, 1939, 1944, 1945 and 1961. The SEC Special Study commented that "[o]ver the years the Commission and the PCBDA have had an informal working arrangement . . . and specific recommendations made by the Commission's staff have, on occasion, been adopted by the Association, including provisions bearing on members' conduct and business practices." SEC Special Study, Part 4 at 690.[13] Copies of the Association's Constitution and By-Laws and all amendments thereto, and all written rules of the Association have been regularly furnished to the Commission, and the Association regularly supplies the Commission with statistics on the volume of options traded. In addition, brokers and dealers in options must register with the Commission pursuant to § 15 of the Exchange Act, 15 U.S.C. § 78o.

Thus, the Association has historically been the medium through which persons engaged in the buying and selling of options regulate their industry. Due to a combination of historical circumstances, the SEC's failure to enact a regulatory pattern of its own, the highly specialized nature of option trading, and the participation of all but a handful of persons in the option industry, the Association has effectively controlled the terms on which options are traded and option firms act. It has, in effect, created and regulated a specialized over-the-counter market for purchase and sale of options. During the period of Vandervelde's membership, there was only one option dealer who did not belong to the Association. That firm was Starr & Gelber, a West Coast house whose principal felt that membership would confer no additional benefit upon his operation.

*The Suspension of Vandervelde*

Article VIII, § 23 of the Association Constitution provides that:

Members accepting public print offers shall be entitled to a reasonable commission, discount or allowance.

It was this provision which brought about Vandervelde's difficulties with the Association. Vandervelde engaged in advertising options and spent considerable sums on such advertising in each of the years of his business. He balked at being required to sell his advertised options to members of the Association at a discount according to the rule. He informed individual members of the Association that he would sell advertised options only as advertised (without discount), and followed this up on January 15, 1963, with a letter to the Association stating that Vandervelde would make it a practice to sell available special options

12. § 9 of the Securities Exchange Act, 15 U.S.C. § 78i, contemplates promulgation of rules which "the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors" governing trading in options (§ 9(b) (1)), transactions in securities by holders of options or for the account of holders of options (§ 9(b) (2 and 3)), and the endorsement of options by any member of a national securities exchange (§ 9(c)).

13. The SEC noted that the Association had incorporated into its own rules many recommendations made by the staff of the SEC in 1935 when federal regulation of option dealing was under consideration.

"The attitude of the Association has always been that it will police its members and it has been most willing to adopt recommendations made from time to time by the Commission's staff. Thus, many of the Association's provisions regulating members' conduct and standardizing business practices in option trading are the result of joint conferences between the Association and the Commission." SEC 1961 Report at 100.

Professor Loss attributes the Commission's failure to adopt any rules under § 9(b) to the fact that "the other anti-manipulative weapons have worked so well that there would be no point in needlessly hampering the legitimate use of options." Loss, *supra*, at 1544.

to dealers at *advertised* prices (meaning, not at discounts therefrom).[14]

The newspaper advertising of options for sale to the public was an important part of Vandervelde's business in puts and calls. Vandervelde often advertised options which had been purchased for inventory rather than for immediate resale and were attractive in price because of changed market conditions. Such advertising of options is used to attract customers and their brokerage firms and to induce them to begin a regular course of business with dealers engaged in such advertising.[15] Vandervelde, in order to be able to compete in price for customers, refused to sell his advertised options to other members of the Association at a discount. He believed, with some reason, that buyers interested in his advertised options would do initial and repeat business with him rather than through their accustomed dealers if the latter were not given any financial incentive to act as the middleman to acquire the advertised options for their customers. More importantly he hoped that brokerage houses which purchased attractive special options from him would develop or maintain a regular course of dealing with him in seeking bids for the purchase or sale of unadvertised options, the largest segment of an option dealer's business.

Vandervelde's resistance to affording a discount to other members of the Association on advertised options came to a head in the summer of 1963. To chill the interest of Filer, Schmidt & Co., a member of the Association, in an option which Vandervelde had advertised, Cohen falsely stated upon inquiry by Filer for the option that it was no longer available; that it had been disposed of. The truth was discovered when Filer had a stock brokerage firm seek to buy the option for Filer's account and found it to be available for sale. Filer then made a

formal complaint against Vandervelde for this business conduct. Vandervelde admitted the facts but responded that he had previously informed the Business Conduct Committee that his companies intended to sell to members at advertised prices with no discount, that the Association dealers were not interested in buying from Vandervelde on this basis and that the false statement had been made to avoid another long telephone dispute about the no-discount policy. In the light of past disputes, Vandervelde stated that he did not intend to reveal his position to dealers who wished to find out if an advertised option were "available", and he intended, on advice of counsel, to maintain his right to do business without granting special favors to his competitors.

During the summer two similar complaints were made by other firms. The Committee submitted a written report to the Board of Directors concerning the Filer complaint in the course of which it reported

It must be obvious that it is contrary to any reasonable standards of proper business conduct for a broker or dealer to misrepresent or misstate facts to another broker or dealer. The statement here that the option was sold when in fact it was not is a clear violation of the rules of proper business conduct.

Speaking of Vandervelde's justification of the deliberate misstatement by referring to the fact that he had announced that he would not sell options to dealers at a discount and that he did not intend to reveal his position to dealers who wanted to know whether an advertised option was "available", the Business Conduct Committee reported further that:

The asserted refusal by Mr. Vandervelde to allow any commission, discount or allowance to a member of the Asso-

14. Of course the price of a negotiated trade of an advertised option will vary from the advertised price in accordance with the market movement of the subject security after the advertisement has appeared and before the trade is executed. Vander-

velde's policy was that, in effect, no further adjustment in the price of the option would be made to allow for a discount to Association members.

15. SEC 1961 Report at 69.

ciation is a clear and unequivocal violation of this provision.

Moreover, Mr. Vandervelde's firm grants a discount to stock exchange firms and accepts discounts from other members of the Association. To the extent that he refuses to allow a member a discount at least equal to that allowed by him to a stock exchange firm, his conduct is discriminatory against a member. To the extent that though unwilling to grant a discount to other members he accepts a discount from a member granting it under the requirements of the above-quoted provision, his conduct, to say the least, is in disregard of the aims and objects of the Association, which are stated to be, in part,

" . . . to prevent any trade practices which are not conducive to harmonious relations among its members. . . ."

The Committee concluded that the misstatement as to the availability of the option was deliberate and in pursuance of a policy of refusing discounts to members of the Association and that

We believe that the misstatement and the policy violate the Constitution and By-Laws and the rules of business conduct established by the Association, and that Mr. Vandervelde and Mr. Cohen should be penalized for such violations in the sum of $125 each.

The Board of Directors of the Association unanimously approved the recommendation of the Business Conduct Committee and levied the fines recommended. The Board held a hearing in connection with Vandervelde's response that it had not done so or heard his side of the matter before levying the sanction. After hearing Mr. Cohen, Vandervelde's representative, the Board reaffirmed its prior determination. The Association advised Vandervelde and Cohen that their memberships in the Association would be suspended unless the fines were paid by August 12, 1963. Vandervelde complained of this action both to the Association and to the Securities and Exchange Commission.

The Commission responded on August 14, 1963, stating that the Association is not registered with the Commission in any capacity, that it has no official standing with the Commission and that the Commission was not authorized to review diciplinary actions by the Association against members. On August 16, 1963, the Association advised Vandervelde that it had received a copy of the Commission's letter of August 14, 1963, and unless the fines were paid by August 26, 1963, suspension would result. Vandervelde did not pay the $125 fine imposed by the Association and his membership was suspended for the reasons set forth in the report of the Business Conduct Committee. On August 27, 1963, Vandervelde was informed that until the suspension was lifted he was not entitled to exercise any of the rights and privileges of membership in the Association, including the use of the Association's contract forms. Each member of the Association was notified of the suspension and that Vandervelde was not permitted to use the form until the suspension was lifted.

### The Questioned Rules—Injury Requirement

■ Plaintiffs dispute the legality of a number of the Association rules. They challenge as violations of § 1 of the Sherman Act the rules that members may deal only in options written on the Association contract form, that only New York Stock Exchange member firms may endorse options, that commissions on cash-ins be the same as those charged by New York Stock Exchange member firms, that options advertised must have a minimum premium of $137.50, and that a discount be granted Association members purchasing an advertised option from another member. A challenge to a rule in a suit such as this falls to the ground unless injury has followed therefrom. Plaintiffs may recover damages only for violations of the antitrust laws by which they were injured, Molinas v. National Basketball Association, 190 F.Supp. 241, 243 (S.D.N.Y.1961), cf. Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1004 (2d Cir. 1970),

cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

The application of that standard to the proof received at trial limits the Vandervelde claims to the discount rule and the suspension which resulted from his refusal to observe it.

With regard to his ancillary claims, Vandervelde's stance is similar to that of the plaintiff in *Molinas, supra*. There, a professional basketball player who had been suspended for life by the National Basketball Association for wagering on games in which he played, brought suit challenging not only his suspension but the legality of the league's reserve clause. This portion of the complaint was dismissed after trial on the ground that "no causal connection . . . [had] been established between the reserve clause and any damage which [plaintiff] may have sustained." 190 F.Supp. at 243. *Cf.* Industrial Building Materials, Inc. v. Interchemical Corp., 278 F.Supp. 938, 968 (C.D.Cal.1967), rev'd on other grounds, 437 F.2d 1336 (9th Cir. 1970) (summary judgment granted for defendant as alternative to dismissal of action for failure to comply with Court's pretrial rulings; held, *inter alia*, that, assuming truth of facts alleged, fact that plaintiff's former supplier's prescription of dealers' territories may have been *per se* illegal under the holding of United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), did not entitle plaintiff to recovery, since his claim was based entirely upon business lost when former customers turned to other distributors as a result of alleged conspiracy by supplier to monopolize trade in his product); Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711, 721 (S.D.N.Y.), aff'd, 417 F.2d 621 (2d Cir. 1969) (motion for preliminary injunction); Lyons v. Westinghouse Electric Corp., 235 F.Supp. 526, 538–39 (S.D.N.Y. 1964) (McLean, J.).

## *The Discount Rule—A Violation*

The dispute between Vandervelde and the Association as to which injury may be said to have been demonstrated herein concerned the discount rule, the means by which Vandervelde claims he sought to avoid compliance with that rule, and the action taken by the Association in response. The issues of antitrust liability in this action rest upon that dispute.

The record does not indicate when the discount rule was adopted in its present form, but the sharing of commissions and the trading of options among Association members on terms more favorable than those at which options were available to non-members was apparently contemplated from the earliest days of the organization.[16]

The rule applies to public print or "special options", those which are advertised by put and call broker-dealers rather than purchased by a broker-dealer in response to a specific request from a potential buyer or buyer's brokerage house. The advertising of options held for speculation in this way by the dealers seems to have begun on a regular basis in the early 1950's. The amount of the dis-

16. The first rules of the Association, which became effective on September 15, 1934, prohibited sale of any option through a broker or dealer "who is not a member of the Association" at a price less than the prevailing charge made at the time by members of the Association to the public "and further prohibited the payment of any discount or division of commission between a member and "any person whomsoever other than a member of the Association." After the effectiveness of the Exchange Act, and the rules promulgated thereunder, the Association altered its rules to permit the sharing of commissions with members of national securities exchanges and, later, with all brokers and dealers registered with the Securities Exchange Commission. The rule in its latest form, according to the documents available to the Court, is embodied in Article VII, § 20 of the Association Constitution, which states that

The division or sharing of commissions . . . from the sale of any . . . option contract with *non-members* shall be prohibited unless said sharing is with a firm or individual registered with [the SEC] and provided said sharing shall not exceed $6.25 for each 30 days option of 100 shares. [emphasis supplied]

count or member's allowance was apparently subject to some negotiation in the course of each trade, but a range of standard discounts did develop. Dependent on the price of the option, the standard discount varied from $12.50 to $25.[17]

The issue here is whether a rule among brokers that a commodity offered for sale by any one of them be sold to another member at a discount from the advertised sales price represents an unlawful price regulation or an attempt to restrict each broker's ability to deal freely with customers. The claimed competitive detriment of the rule is that the advertising dealer is denied an opportunity to attract other buyers directly because any other member may match his price by obtaining the same commodity at a discount. The claimed benefit of the rule is that it recognizes the right of a broker who has found a customer for a commodity advertised by a second broker to be compensated for his service.

■■ The alteration, pegging or stabilizing of the price of a commodity by agreement among competitors is *per se* illegal regardless of the ends the price arrangement is designed to serve. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 210–28, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). This restriction applies to the setting of maximum as well as minimum prices, Kiefer-Stewart v. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (maximum resale prices). The key element in the prohibition is the desire to prevent "agreements . . . [which] cripple the freedom of traders and thereby restrain their ability to sell in ac-

cordance with their own judgment." 340 U.S. at 213, 71 S.Ct. at 260.

In *Socony-Vacuum*, the Supreme Court made it clear that the price-agreements proscribed by the Sherman Act extended beyond agreement and enforcement of a set of uniform prices: "[Prices] are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon." 310 U.S. at 222, 60 S.Ct. at 844.[18]

A second category of arrangements which have been classified as illegal *per se* is the allocation of markets or of certain customers among a group of competitors. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 597–598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); United States v. Consolidated Laundries Co., 291 F.2d 563, 574–575 (2d Cir. 1961).

Defendants argue that Article VIII, § 23 of the Constitution does not constitute price fixing for two reasons: first, sale to other members is not required when a member advertises, second, price is not fixed by the rule, whose only requirement, if it is a requirement, is that the second Association member-firm be granted a commission.

In December, 1962, six months before the transaction which led to the suspension, Godnick & Son complained to the Business Conduct Committee that Vandervelde had sold an option to a brokerage

---

17. The customary discount is $25 if an option is advertised for sale above $200, $18.75 for options below $200 but above $137.50, and $12.50 on an option advertised for $137.50. No discount is required to be given other members on the sale of an unadvertised option.

18. The Court also commented: "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to con-

trol the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive." 310 U.S. at 221, 60 S.Ct. at 843.

firm after informing Godnick that the option had been "sold away". Ten days after the Committee found itself unable to resolve the factual dispute, the Board of Directors adopted a rule of business conduct for members which stated that upon an option's becoming available it must be reoffered in the order in which bids were received during the period of unavailability.[19] While this is not the same as a rule requiring that the option be sold to the first bidder, it does require that an option firm must be accorded equal preference with an outside firm when options are "reoffered" at least apparently to the extent of being accorded a right of first refusal.

█ This rule is difficult to understand if the offering firm has no duty to deal with any potential buyer. The rule is explicable on the assumption that an option dealer should normally sell to any purchaser who will meet his price; and that in the event that purchaser is a fellow Association member, that price will be reduced pursuant to § 23. Promulgation of this rule so soon after the Vandervelde-Godnick dispute lends credence to the inference that it was considered an improper practice to refuse to sell to a member firm merely because the advertiser preferred to do business directly with buyers or their brokerage firms.

It is necessary to appraise the effects of a rule such as § 23 in light of the realities of market activity in the area to which the rule applies. From this standpoint, the absence of a formal rule requiring one member to sell to another may be explained by the fact that normal trading practice makes such a rule unnecessary.

The option business is even more fast-moving than trading in securities generally, since a small change in the price of the subject stock can affect the premium at which an option is sold and even the marketability of that option. The argument that the advertising dealer has complete freedom to choose his customers is contradicted by the realities of trading a commodity of rapidly fluctuating value and restricted appeal in a small market. An option dealer who refuses to sell in response to a bid by a competing dealer runs the risk that in the interim until another bid the value of his option will fall.

The report of the Business Conduct Committee in Vandervelde's own case further supports the indication that a member's unequal treatment of other members was frowned upon as contrary to Association principles. If a member is completely free to structure his transactions as he wishes, it is difficult to understand why his desire to grant discounts to a certain class of customers but not to another class was considered a practice contrary to harmonious trade relations between members.

█ The fact that refusal to sell to other members was not consistently punished by imposition of formal sanctions or that there was no requirement that the dealer sell to any one bidder would not remove the rule from antitrust scrutiny. The courts have emphasized in past decisions dealing with trade association rules that "subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line", United States v. National Association of Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950). *See,* American Column and Lumber Co. v. United States, 257 U.S. 377, 411, 42 S.Ct. 114, 66 L.Ed. 284 (1921). One such motive or inducement is the knowledge that a favor given a competitor will be returned. *Cf.* United States v. Container

19. The rule, adopted on January 9, 1963, read:
Where an option has been offered for sale by a member, and then has become unavailable, and one or more bids shall have been received for such option, and thereafter such option once again becomes available for sale, the failure of the member to re-offer such option to the bidder or bidders in the order in which they made their bids shall be an improper business practice subject to penalties to be imposed by the Board of Directors.

Corporation of America, 393 U.S. 333, 335, 89 S.Ct. 510 (1969).

The evidence is not conclusive on the question of whether a sale to another Association member was itself compelled. There is evidence that such sale was the expected practice and that related sorts of discrimination were fostered by the Association. Moreover, even if the discount rule is viewed as defendants would have the Court view it, merely as a commission-splitting device when a dealer chooses to sell to a fellow member, it has the effect of facilitating the choice to deal through a firm other than the advertising firm, in an atmosphere where the advertising firm's acceptance of such a choice was expected.

More importantly, in Vandervelde's case, coercive action was taken in the form of assessment of a fine and suspension. The Association asks the Court to find that the fine was imposed because a falsehood had been told by one member to another. However, the Business Conduct Committee's recommendation was that "the misstatement *and the policy* (of refusing to grant discounts to members of the Association)" violated the Constitution and By-Laws. The Committee *not only refused to accept the* policy as a justification for the misstatement, but condemned the no discount policy as "a clear and unequivocal violation" of § 23 and Vandervelde's granting of discounts to stock brokerage firms (and acceptance of discounts from other Association members) while refusing to grant discounts to members as "to say the least, . . . in disregard of the aims and objects of the Association", [specifically the objective] "to prevent any trade practices which are not conducive to harmonious relations among its members."

Whatever the validity of a suspension solely for a misstatement, the Court finds that, as the report of the Business Conduct Committee indicates, the statement of Cohen to the representative of Filer, Schmidt, was part of a larger controversy between Vandervelde and the Association on the subject of the dis-count rule and that Filer's complaint related superficially to the misstatement but more importantly to the fact of Vandervelde's having cut him off from bidding on an advertised option. Cohen testified that he had made the misstatement to avoid a dispute about discounts, a fact as to which no contrary proof was offered, and despite some of the other shortcomings of Cohen's testimony, his statement in this regard is supported by the facts of the dispute and is worthy of belief.

Thus, there is evidence that Vandervelde was disciplined for refusing to grant discounts and that both sides understood that or had reasons to believe that the suspension was not one for a misstatement alone. The misstatement's wrongfulness was viewed in this case not as related to a completed transaction but as related to unwillingness to initiate a transaction with another member, and, at bottom, it was this unwillingness for which sanctions were imposed by the Association.

Even if the rule were classified as merely a commission sharing device, it is difficult to escape the conclusion that *the requirement* that the commission be paid if the sale is made would void the rule. Plymouth Dealers' Association of Northern California v. United States, 279 F.2d 128, 132 (9th Cir. 1960).

The key element of the rule in § 23 is that discounts are required for all trades between members on advertised options. An Association's acting to forbid such discounts altogether would run afoul of the Act, Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936), *cf.* Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 270 (7th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). A horizontal agreement fixing uniform discounts would meet the same fate, since such an arrangement would in effect constitute a decision to fix maximum resale prices, illegal *per se*. Albrecht v. Herald Co., 390 U.S. 145, 151, 88 S.Ct. 869, 19

L.Ed.2d 998 (1968); Kiefer-Stewart v. Seagram & Sons, *supra*. *See*, United States v. White Motor Co., 194 F.Supp. 562, 576 (N.D.Ohio 1961), rev'd on other grounds, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). *Cf.* Callaghan & Co. v. Federal Trade Commission, 163 F.2d 359, 373 (2d Cir. 1947).

What the rule here requires is that a maximum resale price be charged a certain class of buyers. Price fixing initiated by a group of powerful buyers, no less than price fixing by sellers, is *per se* illegal. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). *See also*, Live Poultry Dealers Protective Association v. United States, 4 F.2d 840 (2d Cir. 1924), Blue Cross v. Commonwealth of Virginia, 211 Va. 180, 176 S.E.2d 439 (1970) (alternate holding). In United States v. Olympia Provision & Baking Co., 282 F.Supp. 819, 828 (S.D.N.Y.1968), aff'd mem. sub. nom. Provision Salesmen & Distributors Union v. United States, 393 U.S. 480, 89 S.Ct. 708, 21 L.Ed.2d 688 (1969), the granting of uniform minimum discounts to distributors of hot dogs was found to violate the Sherman Act.

It is difficult, however, to classify the discount rule as merely a commission-splitting device. The members of the Association act with respect to advertised options as intermediaries between sellers and buyers of options. But when a dealer holds options for inventory, the advertiser is in the position of a seller and § 23 operates on his freedom of action. If the advertiser sells his option away to another dealer, he does more than merely split his profit, he loses the potential contact with the ultimate purchaser of the option although he hopes by use of his advertisements to open a contact for future dealings.

This loss may come through the mere habit of a broker born of familiarity or the impulse to give reciprocal business. Brokerage houses develop a regular course of soliciting bids on potential buy or sell orders from a group of firms, and the 1961 SEC study confirms that such

patterns exist. SEC 1961 Report, at 80, 81. More importantly, however, the fact that the dealer purchasing an option would receive a discount on his own purchase may enable him to undersell the advertising dealer; to charge less for the option after purchasing it at a discount under the rule. The subsequent transaction is virtually risk-free as far as the intermediary option firm is concerned.

The defendants argue that any buyer who wanted to buy through Vandervelde could do so. Indeed the record indicates a practice of an interested brokerage firm of calling both the advertising dealer and the second option firm, with the thought, perhaps, of obtaining the lowest possible price for its client. However, such freedom on the part of brokerage houses is detrimental to defendants' case. There are two variables which determine the salability of an option, its price and its terms. An advertised option may or may not be easily duplicable, but it does not seem "specious" to accept the fact that a buyer would bid a dealer other than the advertised dealer for an option only if the buyer could obtain the option at an equally satisfactory price from the second dealer. What the defendants' argument reduces to is the proposition that when a prospective buyer chooses a firm other than the advertising firm to make the trade, the dealer has found a buyer for the advertising firm and should be compensated. However, it is the existence of the discount rule itself which provides the impetus for such selection or at least makes such selection economically feasible, for only if the intermediary dealer can purchase from the advertising dealer at a discount does the selection become an economically rational one. *Cf.* United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

The agreement embodied in § 23 of the Association's Constitution involves not merely the exchange of price information for a fungible item, but the imposition of a maximum resale price for a

relatively unique and speculative item, for the benefit of a uniquely situated class of buyers, in an atmosphere in which bidding through those buyers by ultimate buyers may be expected and in which refusal to deal with such class of buyers, if not prohibited by a combination of trade practice and market reality, is subject to substantial disapproval.

The pooling of profits among competitors "at least reduces incentives to compete", Citizen Publishing Co. v. United States, 394 U.S. 131, 135, 89 S.Ct. 927, 929, 22 L.Ed.2d 148 (1969). In United States v. American Smelting and Refining Co., 182 F.Supp. 834, 860 (S.D.N.Y.1960) an arrangement was found unlawful whereby one producer of lead acted as the exclusive seller of a portion of the production of a second producer in a designated area of the country. The Court noted that the benefit of such an arrangement to the producer whose sales through its agent were assured was "hardly mysterious": "It gets a share of the . . . market without the necessity of competing with St. Joe and without the risk to prices that such competition would entail." The Court refused to accept justification of the price averaging provision between the two producers on the ground that the producer who acted as agent provided the benefit of its sales organization for its "principal", in terms which are relevant to the justification for the commission-sharing offered by defendants here: "The availability of St. Joe's experience and expert sales organization in the East, eliminating for Bunker Hill the trouble and expense of having one of its own can only be regarded as incidental (nor would such an economic consideration be relevant to the issue of whether there has been an antitrust violation). [The fact that the agent can obtain those grades [of lead from the second producer] without having to produce them itself, when it is a potential competitor, helps to establish the unreasonableness of the agreement. The Sherman Act proscribes restraints of potential competition as well as restraints of actual competition." 182 F.Supp. at 860.

The compulsory granting of discounts on sales to Association members tends to the same ultimate result as that proscribed in the *American Smelting and Refining* decision. The ability of a competitor to meet the advertised price of a special option potentially reduces the incentive to market a similar option and makes available the output of another dealer at an insured competitive price.

It is true that "the Sherman Act was not designed to compel businessmen in any industry to compete in any particular way", United States v. Morgan, 118 F.Supp. 621, 738 (S.D.N.Y.1953), but it proscribes a variety of means by which competitors may agree not to compete. Section 23, whether viewed as setting a maximum resale price or making mandatory the granting of a commission to fellow Association members, is a direct regulation of price and of the advertising dealer's ability to attract customers. Whatever the propriety of such a commission allowance as a matter of business ethics—an argument which is dubious justification in this context—such considerations do not rescue an arrangement among competitors with these effects on competition from prohibition. When the competing inferences which the parties ask the Court to draw are sifted through and the competing characterizations offered for the rule are analyzed and discounted where necessary, the fact remains that § 23 involves the imposition of a restriction upon the freedom of the individual members of the Association to set and abide by their own price in the limited marketplace in which they operate. Such restrictions are at the heart of the Sherman Act's prohibitions. Kiefer-Stewart v. Seagram & Sons, *supra*; Plymouth Dealers' Association of Northern California v. United States, 279 F.2d at 132.

A recent decision in the Central District of California has concisely restated the rationale underlying the iden-

tification of certain trade practices as illegal *per se* under the antitrust laws:

> The primary disadvantages of the 'rule of reason' are that it requires difficult and lengthy factual inquiries and very subjective policy decisions which are in many ways essentially legislative and ill-suited to the judicial process. . . . The Supreme Court has on numerous occasions recognized these difficulties and has declared that with regard to certain practices the problems of making adequate economic determinations and setting appropriate guidelines are so complex that they simply outweigh the very limited benefits deriving from those practices and have declared them to be illegal *per se*.

> Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1063 (D.C.Cal.1971) (Ferguson, J.)

Since the *Socony-Vacuum* decision, the Courts have restated the unlawfulness of price arrangements in terms which leave little room for justification and which are more than sufficient to include within the area of prohibited activity the mandatory granting of a discount on sales by one competitor to another. Accordingly, the discount rule must be held to violate § 1 of the Sherman Act.

### Liability for Resulting Effects

Defendants contend that there was no concerted refusal to deal with Vandervelde after the suspension and that the Association cannot be held liable for the acts of individual stock exchange houses in reaction to the suspension. Neither contention is correct.

"[I]t is unreasonable, *per se*, to foreclose competitors from any substantial market," International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947), and, "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed. 2d 741 (1959) ; Radiant Burners, Inc. v. Peoples Gas Co., 364 U.S. 656, 659–660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam) ; Silver v. New York Stock Exchange, 373 U.S. 341, 347–349, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

■ Upon suspension, Vandervelde was denied use of the standard form of option contract, and brokerage firms which inquired as to Vandervelde's status were informed of this fact. As indicated above, members of the Association agreed to deal only in options written on the standard form, and use of such form was recognized as one of the major achievements of the Association bringing stability and safety to organized option trading. Thus, at the very least, Vandervelde was denied the opportunity to engage in business upon the same terms and conditions as all but one of his competitors in the over-the-counter option market. He lost "a means of doing business which was of substantial value to . . . the conduct of [his] business. The very nature of the business in which [he was] engaged makes this abundantly plain." Silver v. New York Stock Exchange, 196 F.Supp. 209, 223 (S.D.N.Y. 1961), rev'd on other grounds, 302 F.2d 714 (2d Cir. 1962), rev'd on other grounds, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

■ The fact that the West Coast firm, Starr & Gelber, chose to do business and was able to do so successfully, without the benefits of Association membership, does not alter the effect of a suspension on a dealer who wished to avail himself of the Association's imprimatur and the ability to trade through the marketing mechanisms which Association regulation had created. Associated Press v. United States, 326 U.S. 1, 17, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), Silver v. New York Stock Exchange, *supra*, 196 F.Supp. at 223. Nor does the fact that Vandervelde may have been able to deal with individual Association members, as Starr & Gelber did, immunize the effect of denial of the use of the Association's form, Silver v. New York Stock Exchange, 373 U.S. at 348–349 n. 5, 83 S.Ct. 1246, especially since most of Vandervelde's business was conducted as

intermediary between the customers of brokerage houses.

In the *Silver* case, member firms of the New York Stock Exchange terminated their private wire connections with plaintiff, an over-the-counter securities dealer, after the refusal of the Exchange to approve the connection. The Supreme Court had no doubt that absent the possible justification for the Exchange's action provided by the powers of self-regulation granted to it by the Securities Exchange Act, 15 U.S.C. § 78a et seq., especially 15 U.S.C. §§ 78f(b) and (d), the termination of the wire connection was in violation of the Sherman Act. 373 U.S. at 348–49, *see* 302 F.2d at 716. The Court noted that by denial of the wire connection Silver was "hampered substantially in his crucial endeavor" through loss of "important business advantages." 373 U.S. at 348–349 and n. 5, 348–349, 83 S.Ct. 1246.

The key to defendants' argument is the contention that any "hampering" of Vandervelde's business arose out of the reaction of the stock exchange firms to the suspension, for which the Association cannot be held responsible because of Vandervelde's failure to show the element of proximate causation between the suspension and the termination of their business. They interpret the Court's dismissal of the action as to the stock exchange firms as holding that the put and call defendants did not induce any refusals to deal or other acts by the stock exchange firms which chose not to deal with a suspended put and call dealer.

The Court dismissed the action against the stock exchange defendants on the ground that none of those defendants "acted in concert with any other defendant, person, firm or association in electing not to deal with or endorse options for plaintiffs. . . ." Vandervelde v. Put and Call Brokers and Dealers Association, 1971 Trade Cas. (CCH) ¶ 73,728 at 91,042 (S.D.N.Y.1971). The Court found that "None of the said Stock Exchange defendants were informed or requested or given the suggestion by anyone that it should not do business with

Mr. Vandervelde. . . ." However, the record shows and the Court held that "the mere fact of suspension of a put and call dealer from the said Association is a factor on which business with such dealer is declined without further inquiry concerning a suspension, its causes or its merits, or the legality thereof." 1971 Trade Cas. (CCH) ¶ 73,728 at 91,041.

The stock exchange firms' acts were triggered by the suspension. Thus, duPont justified its refusal to have further business dealings with Vandervelde on the ground that it chose not to deal with one who had been found by his peers to have violated the rules of an association which he voluntarily joined. Bache first questioned plaintiff's financial stability after the suspension, and then in connection with trades in process, and Merrill Lynch invoked a long-standing independently arrived-at policy to deal only with members of the Association when seeking to complete buy orders initiated by its clients. All of the firms emphasized that they would not resume dealing with Vandervelde until he was again a member in good standing of the Association.

 The Association's own publications and statements indicate that it placed great importance on its success as a self-regulatory body insuring ethical and commercial responsibility within its segment of the financial community. However, the fact that the purposes and acts of a trade body formed to improve standards of conduct and methods are otherwise beneficial does not immunize the imposition by that body of limitations upon the freedom of competitors such as occurred here. United States v. American Medical Association, 110 F.2d 703, 712 (D.C.Cir.), cert. denied, 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411 (1940) (upholding indictment). There is a "very real difference" between the use of self-regulation to further such purposes and an effort by the Association to hamper ability to do business of a firm which refuses to abide by a regulation which itself is an unlawful arrangement concerning the prices of the goods which

members sold. *Cf.* American Medical Association v. United States, 130 F.2d 233, 248 (D.C.Cir.1942), aff'd, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (upholding conviction).

Defendants' contention amounts to an argument that they are not liable for the results of their suspension of Vandervelde unless those who chose not to deal with a suspended member acted pursuant to an agreement so to do.

■ A boycott within the meaning of the Sherman Act includes even the peaceful persuasion of a person to refrain from doing business with another, Cooperativa de Seguros Multiples De Puerto Rico v. San Juan, 294 F.Supp. 627, 629 (D.P.R.1968); Lawlor v. Loewe, 235 U.S. 522, 534, 35 S.Ct. 170, 59 L.Ed. 341 (1915); *cf.* Professional & Businessmen's Life Ins. Co. v. Bankers Life Co., 163 F.Supp. 274 (D.Mont.1958). A boycott produced by peaceful persuasion is as much within the Act's prohibitions as one where coercion of third parties is present. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 467, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

■ There is evidence that the Association realized that the suspension of a dealer was an implied statement that the dealer had violated the standards which the Association fostered. The fact that the Association did not attempt to solicit directly the enforcement of their suspension by the stock exchange firms does not rob the suspension of its potential impact as a sanction. To say that an additional request must be made would be to require a mere formality. Any suspension such as this contains an implied recommendation that business not be done with the suspended member. The Association hoped that its suspension would lead buyers and sellers of options to withdraw their patronage from Vandervelde (or for that matter from any suspended member), and the Association is not free from liability for the natural consequences resulting from its activities. When the stock exchange firms made independent judgments to protect their clients with no intent to

further the Association's rules they did not cast a protective shield over the Association.

In Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), the Supreme Court held unlawful the circulation among the members of various associations of retail dealers of a list of wholesalers which had done business directly with the public. Because the Court's opinion deals directly with the sort of prejudice inherent in publication of a trade association's disapproval of a member, the opinion is quoted at some length:

[T]he circulation of such information among the hundreds of retailers as to the alleged delinquency of a wholesaler with one of their number had and was intended to have the natural effect of causing such retailers to withhold their patronage from the concern listed. . . . The circulation of these reports . . . directly tends to prevent other retailers who have no personal grievance against him, and with whom he might trade, from so doing . . . not because of any supposed wrong which he had done to them, but because of the grievance of a member of one of the associations, who had reported a wrong to himself, which grievance, when brought to the attention of others, it was hoped would deter them from dealing with the offending party. 234 U.S. at 609, 612, 34 S.Ct. at 953, 954.

The fact that the circulation of such reports on the complaint of a retailer by the Association served as implicit evidence of a conspiracy to boycott offending wholesalers, a separate part of the Court's holding, does not support the argument that liability for the result of the boycott depended on each member who received the report being found a conspirator:

True it is that there is no agreement among the retailers to refrain from dealing with listed wholesalers, nor is there any penalty annexed for the failure so to do, but he is blind indeed

who does not see the purpose in the . . . circulation of this report. 234 U.S. at 608–609, 34 S.Ct. at 953.

The same principles are discussed in Caldwell-Clements Inc. v. Cowan Publishing Co., 130 F.Supp. 326 (S.D.N.Y.1955). There, defendants' claim, that an allegation that they sought to damage plaintiff by circulation of untrue statements about plaintiff did not state grounds for relief under the antitrust laws, was rejected. What distinguished the acts alleged from a mere competitive tort, the Court stated, was "the concert of action . . . by competitors with the specific purpose and result of 'reducing' [plaintiff's] ability to compete. . . . That the means chosen to accomplish this end were the 'peaceful persuasion' of plaintiff's actual and prospective advertiser-customers by the distribution of false writings concerning plaintiff's business methods does not insulate the defendants from liability." 130 F.Supp. at 328. *Cf.* Restatement of Torts §§ 766(b), 768(1) (c) (1939).

The suspension was an attempt to exert economic pressure on a competitor to induce him to act in a manner in violation of the antitrust laws. The inducement to compliance consisted of withdrawal of both the privileges of membership and an industry "seal of approval" with recognized significance in the marketplace. In light of the recognized purpose of the Sherman Act to protect "the freedom of individual business units to compete unhindered by the group action of others," Silver v. New York Stock Exchange, 373 U.S. at 359–360, 83 S.Ct. at 1258, defendants' contention is rejected.

*The Injury*

The primary materials which the Court must utilize in assessing the damage caused Vandervelde by the suspension are contained in the books and records of the two plaintiff corporations.[20] Analyses of the substance and meaning of these records were offered by three witnesses: Vandervelde; Stanley Topper, a certified public accountant who served as defendants' expert witness; and Ernest Sommer, a CPA who appeared on plaintiffs' behalf to dispute Topper's testimony.

The question for resolution is whether the injury Vandervelde suffered was the forced termination of his business, or whether the injury amounted only to the loss of some fragment of his business in the period between the suspension and the decision to cease operations, were the Court to find that the cessation itself was not the result of losses caused by the suspension.

The picture plaintiffs present of operations is that the corporations, taken together, were profitable during 1960 and 1961, that the business experienced substantial declines as a result of the market break during the spring and summer of 1962 and the newspaper strike during the winter of 1962, but that a recovery had taken place in the summer months of 1963 which was cut off by the suspension.

Defendants, on the other hand, argue that the business was marginally profitable at best, that it endured continuing losses in the period after the 1962 market break began, and that by the date of the suspension the business was valueless.

Plaintiffs offered no detailed proof as to the condition of the companies' financial accounts after the suspension, nor did they explain the details of their operation before the suspension. At a reconvened hearing requested by plaintiffs, Mr. Sommer presented an analysis which closed to some degree the gaps in the proof previously offered.[21]

20. The journals and ledgers of the California and New York corporations and the work sheets which reflected option trading activity were placed in evidence.

21. A trial judge has some duty to go beyond the testimony of experts to the raw material on which damage calculations and questions of causation depend. Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). A jury in a treble damage action is not restricted to the testimony of expert witnesses in assessing damages. *See* William H. Ran-

At that hearing, the plaintiffs' expert introduced for the first time the theory that in assessing the impact of the suspension and the amount of damages incurred, Vandervelde should be viewed as carrying on two distinct businesses, a commission business [22] as a put and call broker-dealer, and a business as a writer of puts and calls and that it was the commission business which was harmed. For the reasons discussed below, this theory is accepted as, under the proofs presented, the most accurate characterization of the business Vandervelde entered in 1959 and left in 1963.

The thrust of Sommer's analysis was that the commission business had by the summer of 1963 recovered from difficulties caused by the general depression in the securities markets and the four month newspaper strike which reduced plaintiffs' business because of their inability to advertise regularly in New York. Sommer's testimony demonstrated, and the books of the corporations indicate, that the business was economically viable in August, 1963 and had shown some signs of increasing volume and a return to profitable operations in June, July and August, 1963. Although expenses had been cut back by the reduction of the office staff and paring of salaries of those who remained, operating expenses had remained stable. The books present a picture of a business cutting back, not one planning to expire.

Sommer calculated that the commission business had earned $5,589 in the eleven month period preceding the suspension; that $18,363 was earned during the three months June 1–August 31, 1963, offsetting losses of $12,774 incurred in the preceding eight months.

The defendants challenged Sommer's figures as improperly reflecting as commission income $26,137.75, which was income from the writing of options.

The $26,138 item was transferred from commission income on the California books to expired premiums on the books of the New York corporation. Expired premiums are of course income from option writing. On the New York income tax returns this sum was reported as "income" but plaintiffs admit New York had no commission income.

The Court finds from all the evidence that the conflict should be resolved in accordance with the contention of the defendants and that Sommer's treatment of this entry was incorrect.

Since the transfer of the $26,138 item was not of any one identifiable credit to commission income, it is impossible to determine for which month or months in the 1963 fiscal period commission income should be reduced by the transfer. If the amount is averaged over the 1963 fiscal year, commission revenue is reduced by $2,178 per month from the figures Sommer used.

When the underlying revenue figures are reduced accordingly, the Sommer net profit earnings during the June–August, 1963, "recovery" period is reduced from $18,363 to $11,829, or an average net profit of $3,943 per month instead of $6,121. Cohen, the manager of the New York office received no salary; his expectancy of compensation rested with the chance to purchase a quarter of the business. A reasonable salary for the position Cohen held was claimed to be approximately $12,000, the salary which Cohen's predecessor had received. If a

---

kin Co. v. Associated Bill Posters of U.S., 42 F.2d 152, 156 (2d Cir.), cert. denied, 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765 (1930) and Farmington Dowel Products Co. v. Foster Mfg. Co., 421 F.2d 61, 85–86 (1st Cir. 1970).

22. Put and call firms normally act as intermediaries between buyers and sellers of options, performing what is in effect a brokerage function. However, in completing trades they act as principals, purchasing an option from the writer and reselling it to the buyer. The put and call firm's profit is thus semantically not a brokerage commission but the excess of sales price over purchase price. The firms which inventory options for later resale if demand develops act as dealers in the traditional sense of that term. The phrase "commission income" or "commission business" refers to both aspects of a put and call firm's operation.

**144**

charge for the $12,000 annual salary is projected, net profit for the 1963 summer period is further reduced to $2,943 for each of those months.

The evidence indicates that the business still possessed an ability to earn profits which was not competely cut off by the admittedly serious net losses of the 15 months preceding the suspension.

After the suspension, the business suffered a new sharp reversal. In September, 1963 according to Sommer, the business showed a net loss of $3,920. However, part of the $26,138 overstatement of commission income affects the September results as well and when Sommer's figure is adjusted accordingly, the loss incurred in September, 1963 is increased to $6,098. The October loss according to Sommer, was $2,600. Sommer estimated that a similar loss had occurred in November, but he admitted that this last figure would be only a guess.

The record of options sold by plaintiffs similarly indicated a marked downturn after the suspension.

■ Plaintiffs rely upon the condition of their business after the suspension for inferential proof that the loss of patronage of the six stock brokerage firms was a fatal blow to their prospects. Such a method of proof of damages is permissible. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); William H. Rankin Co. v. Associated Bill Posters of U. S., 42 F.2d 152, 155–156 (2d Cir.), cert. denied, 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765 (1930) (termination of profitable license by association of billboard owners). However, the Courts have recognized that mere coincidence of declining business and an activity in violation of the antitrust laws is not an adequate showing where attribution to other factors is indicated by the evidence. Especially difficult questions arise where unfavorable variations in business are themselves offered as the chief proof of impact on plaintiff. See, e. g., E. V. Prentice Mach. Co. v. As-

sociated Plywood Mills, 252 F.2d 473 (9th Cir.), cert. denied, 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844 (1958); Wolfe v. National Lead Co., 225 F.2d 427, 430 (9th Cir.), cert. denied, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); Dipson Theatres v. Buffalo Theatres, Inc., 190 F. 2d 951, 961 (2d Cir. 1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952).

■ Vandervelde did endeavor to identify the specific relationship between the suspension and the decline of his fortunes in the inability of his business to do further business with the six stock exchange houses originally named as defendants. The evidence is sufficient to show that the loss of the prospect of patronage of these firms was a substantial or material cause of the failure of Vandervelde's business as an option broker-dealer after August 26, 1963.

Vandervelde explained that the six firms had been his major source of purchased options and that Bache had been his major converter until the time of the suspension. He contended that it was the refusal of the stock exchange firms to deal with him that affected his business principally.

The defendants showed that Vandervelde had annually sold only 13% of his options to the six firms and that during the last year of business the total was only 11.7%. This, however, does not account for Vandervelde's loss of the opportunity to bid for options written by customers of the six firms. Defendants themselves in effect concede the need of Vandervelde to be able to bid widely in order to participate in the option business.

The record shows that Vandervelde bought 16.4% of the options he sold through purchases from four of the six stock brokerage firms during his last eight months of operations.

The importance of a stock exchange firm's patronage to an option broker-dealer is understated by concentrating only on the percentage of total sales made to clients of that house.

The plaintiffs' burden of proof of the fact of injury was satisfied by a showing that the antitrust violation of which they complain "materially contributed" to their injury. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). That other factors may also have contributed to the damage of which plaintiffs complain, will not bar recovery. Momand v. Universal Film Exchanges, 172 F.2d 37, 42–43 (1st Cir. 1948), cert. denied, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949) (relying in part on Restatement of Torts § 431 (1934)). *But see* E. V. Prentrice Mach. Co. v. Associated Plywood Mills, Inc., 252 F.2d 473, 478–479 (9th Cir.), cert. denied, 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844 (1958). Plaintiffs were required to show that the conduct of which they complain was a substantial cause of their injury, but they did not need to show that it was a more substantial cause than any other. Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 805–806 (1st Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964).

The impact of contributing causes—other than the effects of the antitrust violation—on the injury for which a treble damage plaintiff seeks compensation is properly a question of the amount of damages which may be recovered. Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 114 & n. 9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969) ("Zenith had in fact been injured to some extent" by Hazeltine's acts and this was sufficient to satisfy the burden of showing fact of damage.) *Cf.* Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 70 (2d Cir. 1971), cert. granted, 405 U.S. 915, 92 S.Ct. 960, 30 L.Ed.2d 785 (1972).

Defendants contend that the business' losses after August, 1963 are explained by the structural problems which reduced the business' capacity to earn profits even under favorable circumstances. They emphasize in this regard the inability to write options. However, even by defendants' own figures, the proportion of options sold which had been directly or indirectly written by Vandervelde was only 28.2% on a four year average; the number of options written during the summer months of 1963 was quite small, accounting for only 6% of options sold. Moreover, it is difficult to draw any direct correlation between the profitability of an option commission business and the number of options sold [23] and the fact that Vandervelde's ability to participate in option dealing was reduced when he could no longer write options to meet bids does not indicate inability to earn profits acting as intermediary between independent buyers and sellers. The fact that the level of average income shown for the three months of the summer of 1963 is below that of previous years is some indication of the reduction in the scale of operations Vandervelde would experience acting strictly as a commission broker, but the results for the summer months show that the business retained potential for profit earning, and the loss of that opportunity is the focus of Vandervelde's recovery.

The 15 month loss history, which spans two fiscal years, must be balanced against the facts that the commission business had produced a steady stream of income until the summer of 1962 and possessed the ability to earn profits in 1963. The six month period, December, 1962 to May, 1963 when plaintiffs experienced the lowest volume of option business during any six month period since the initial year of their operations, was also the period at which volume of options sold by all members of the Association was at its lowest level since October, 1959.

The net losses of capital from both the conduct of the option commission and

23. Elgin Cary, the former manager of the New York office, called as a witness by defendants, testified that option writing ability, both in the corporation and the Vandervelde family accounts, contributed to the flexibility of the option dealership.

option writing operations was serious, but as of September, 1963, Vandervelde apparently still possessed the capital, or much of it, with which he had begun business, approximately $108,000,[24] according to the corporate tax returns. The evidence established that the amount of capital necessary to operate a put and call dealership was well within the amount still available to the two corporations. Of course, the funds required would increase if the dealer planned to inventory options and would increase even further if use of funds to underwrite the writing of options were envisioned.

It is to be noted, of course, that the commission revenue had declined and that, more importantly, in a period of industry-wide decline, Vandervelde's share of the market had also declined. While this downward trend is significant for assessment of the value of the enterprise, a downturn, even a serious one such as is shown to have occurred here, does not conclusively determine an enterprise's viability—its ability to earn profits at some level.

Vandervelde had the capacity to stay in business as a put and call broker-dealer in August, 1963 although his would have been a small scale dealership. The suspension seriously impaired his capacity to continue this business, acting as an intermediary between buyers and sellers of options, judging from the results of September and October. Sources of option buyers and sellers were restricted and the goodwill which Vandervelde had built up in maintaining working relationships with brokerage house personnel was curtailed.

 When all of the proof offered by the parties is looked at together, the suspension still appears to have been a substantial factor in the drop in volume

of options and income earned which occurred after August, 1963 and it cannot be said that that downturn was merely a continuation of the earlier reverses the business had suffered. The factors defendants emphasize are not without significance, since they affect directly the value which can be placed upon the expectations of profitability which plaintiffs might have legitimately possessed during August, 1963. But these factors do not suffice to render meaningless or insignificant the further reductions which resulted from the suspension or the effect of these further losses on Vandervelde's further prospects.

Even allowing the evidence presented by the defendants its fullest possible weight, the suspension was a material cause of Vandervelde's decision to leave the put and call business. Although the business may already have been in poor condition economically to endure further reversals, the suspension was a reversal for which the defendants were responsible and, at the time, it appeared that this reversal could only be cured by Vandervelde's readmission into the Association.

Defendants contend that if the situation had been as crucial as Vandervelde now says, he could have paid the fine and re-entered the business. Further complaints arising out of his refusal to allow discounts were pending and the wording of the judgment of suspension indicates that, whatever role the misstatement played in the suspension) Vandervelde's policy was by itself a serious breach of Association rules. It is difficult to separate out the effects of the suspension from other factors and where defendants' acts are proven to have been a substantial cause of the injury suffered, defendants should not be able to profit from the uncertainties which their action has created.

24. If one accepts Vandervelde's testimony that his investment in the New York corporation included a $50,000 or $75,000 loan which was not repaid him by the time of the suspension, then Vandervelde's investment would appear to have been impaired in that amount. The accounting material included in the tax returns does not indicate the existence of such a loan, but even if the loan was made and not repaid, the loss would not have been sufficient to force Vandervelde from the option commission business.

Whatever impact the suspension had upon the commission business, it is far more difficult to find evidence of the manner in which it affected the option writing business. While Vandervelde testified that writing options as a broker-dealer had advantages that writing options as an independent writer did not, he never explained what those advantages were. Presumably, there are no commission costs, since the option writer's commission and the option dealer's commission are paid to the same person, the corporate writer. Probably more importantly, the dealer is in a far better position to write options as a speculation, since he can write to meet specific orders from a more central position than a writer operating through brokerage house and put and call dealer representatives. However, even if it is assumed that the damage to the commission activities was fatal to the sort of option writing activities Vandervelde wished to carry on, the fact is that that activity had had no history of profit. Plaintiffs' expert, Mr. Sommer, testified that on the basis of the record of the two operations, he would recommend that a client continue the commission business but liquidate the option writing operation which showed losses of $25,183 per year on a four year average.

The question which remains to be considered is the amount of damages to which Vandervelde is entitled for the destruction of his business as a dealer in securities options.

*The Assessable Damages—*
*Corporate Plaintiffs*

Selection of a method for assessing damages depends first on a computation of the amount the commission business' history shows it might reasonably be expected to have earned on the basis of its condition at the date of the suspension.

Vandervelde's computations indicated that the business earned on a four year average, up to the date of the suspension, $72,970 before taxes. The corporate tax returns, on the other hand, for the full four fiscal years (including a month of post-suspension operations) indicate average earnings of $9,827 before taxes.

Although plaintiffs strenuously contended that the losses from securities transactions totalling approximately $234,000 were "unrelated" to the corporate activities as a writer of options, the evidence strongly indicates, and the Court finds, that Vandervelde's "trading" decisions were the product of and determined by the utilization of his portfolio to write options. The total securities losses must be included in determining the profitability of the Vandervelde operation as a whole.

Vandervelde treated the full amount of his securities losses as related to his put and call business when he reported the securities as inventory on the corporate tax returns and deducted the losses against ordinary income. The corporation's treatment of these losses in their entirety was consistent with this Court's independent determination of the issue on the facts and circumstances herein.

Sommer accepted the tax returns as a correct summary of total operations (as defendants argued), but in calculating the value of the commission segment of the business he eliminated option writing losses. His theory was that the profits of which plaintiffs were deprived were from the commission business and that this was not affected by losses in the other branch of the Vandervelde operation. Sommer computed net income on a basis which attributed almost the entire cost of the total operation to the commission business. The failure to subtract securities losses is justifiable on the theory that it was only the commission business which was injured and which was to be valued. The Court has found that option writing losses did not deprive Vandervelde of capital necessary to operate the commission business. While the securities losses did offset commission income for tax purposes, this fact is not a final determinant where the issue is computation of the amount which the commission business was able to earn.

If a salary is charged against income for Cohen's services and appropriate tax

rates are applied, the three year annual average of the net profit on the commission business is approximately $8,900. This $8,900 average figure understates the business' earning ability, since approximately $9,500 of the 1963 loss is fairly attributable to the period of operation after the suspension. Consequently, an upward adjustment is necessary to compensate for this understatement, and the Court finds that $10,000 fairly would represent the average earning capacity of the commission business except for the fact that a portion of the commission business was attributable to the options which Vandervelde himself wrote.

 Compensating for that exception reduces the average earnings generated through commissions to an annual amount of $7,840.

Neither side produced any evidence as to the amount of commission earnings attributable to options secured from the writing accounts over which Vandervelde had control. Defendants produced a schedule based on the books of the corporations showing that 21.6% of the options sold during the corporate fiscal years 1961, 1962 and 1963 came from corporate or family accounts.[25]

There was no indication that the sale of self-generated options was any more or less profitable than sale of options generally, and the most appropriate method to include this factor in the designation of an earnings history is to reduce the average income factor by an amount equal to the proportion of all option papers sold composed of self-generated options. On this calculation the average earnings generated by sale of options as intermediary is, as stated above, $7,840.

The defendants argue that any income average should be further reduced by weighting more heavily the results of the last year of operations. Topper testified that he would assign a factor of 4 to the 1963 fiscal year and the factors 3, 2 and 1 to the three preceding years in computing an earnings average. Sommer stated, on the other hand, that while the fourth year should be included in any average to give a full picture of operations, the existence of external factors influencing the decline would cause him to deny any special weight to the last year. Sommer admitted that the decline in the last year was in excess of the decline experienced by the put and call industry as a whole.

 There is no material available in the record to precisely determine the portion of the 1963 losses caused by factors endemic in Vandervelde's operation as opposed to the factors explicable by the market break and the newspaper strike. Since the business could not under the facts and circumstances be valued at other than a low multiplier, largely due to the weakening of Vandervelde's competitive position pointed up by defendants' evidence, an additional weighting of the results of the last year is not called for. The records of the business for the summer of 1963 do indicate that the business retained an ability to earn a level of monthly profits consistent with the results of the three year average. While the recovery does not bear the extraordinary significance plaintiff's earlier submissions contemplated, a further weighting of the uncertainties of the situation in defendant's favor is not warranted. The weighting of the more recent years in capitalizing earnings may normally be proper or even required, Taylor v. B. Heller and Co., 364 F.2d 608, 614 (6th Cir. 1966), but where, as here, special external factors account for the drop, the Court feels that no such special weighting is required. A three year average accurately

25. Options written by Model Roland Account # 101 have been excluded from this calculation. This was the account of a Vandervelde client. Unlike the family accounts, there was no proof that Vandervelde had full discretionary control of this account, and the account seems to have been that of a client who customarily deals with a single option dealer. If Model Roland # 101 is included in the three year average, that average is 26.9% and the earnings stream would be reduced to $7,310.

reflects the "earnings base . . . of the business which was actually destroyed." *Id.*

In support of a lost profits measure of recovery, plaintiffs ask the Court to accept a projection of Vandervelde's future profits based on the annual growth of volume of options sold after August, 1963. There was, however, no credible evidence as to the extent Vandervelde might have been able to participate in this growth. The company accounted for 4.3% of the options sold in the industry in 1962, but only 2.13% in 1963. Moreover, although the business would have been able to continue operating except for the suspension, the Court has found that such operation would have been on a reduced scale.

While evidence of market trends or industry growth is admissible as part of proof of damage in an antitrust action, as is expert testimony as to anticipated gross receipts, *see, e. g.,* Bruce's Juices v. American Can Co., 87 F.Supp. 985, 992–993 (S.D.Fla.1949), aff'd, 187 F.2d 919 (5th Cir.); appeal dismissed 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 427 (10th Cir.), cert. denied, 344 U.S. 837, 73 S. Ct. 46, 97 L.Ed. 651 (1952); A. C. Becken Co. v. Gemex Corp., 272 F.2d 1 (7th Cir. 1959), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 876 (1960), opinion on remand, 199 F.Supp. 544 (N.D.Ill. 1961), aff'd, 314 F.2d 839 (7th Cir.), cert. denied, 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963); Locklin v. Day-Glo Color Corp., 429 F.2d 873, 883–84 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971), the weight of such evidence is for the trier of fact. The cases cited above concerned assessment of lost profits by surviving businesses with extensive past histories of earnings. To base the damage award on a yearly projection of future profits for a period of years "during which the company neither existed nor made profits . . . relies too heavily on speculation and conjecture. . . ." Farmington Dowel Products Co. v. Forster Mfg. Co.,

421 F.2d 61, 81 (1st Cir. 1970). *See also* Bruce's Juices v. American Can Co., *supra,* 87 F.Supp. at 992.

No projections as to future costs or ability to share in market growth were offered. *Compare,* Farmington Dowel Products, *supra,* 421 F.2d at 83 (exclusion of expert testimony valuing business solely on basis of projected future profits was within the trial court's discretion; "No consideration was given . . . to future costs of labor, executive salaries, supplies or equipment."), *with* Autowest, Inc. v. Peugot, Inc., 434 F.2d 556, 564 (2d Cir. 1970) (action for wrongful termination of automobile distributorship franchise, 15 U.S.C. §§ 1221–1225; "These projections were no mere 'interested guess' prepared with an eye on litigation. Instead they were the product of deliberation by experienced businessmen charting their future course." 434 F.2d at 566). The assumption that there would be a direct correlation between the number of options sold in the industry and the growth or stability of Vandervelde's profits is highly speculative.

Finally, considering the whole of the evidence, there is a doubt as to whether Vandervelde would have been willing or able to continue in the business throughout the decade of the 1960's. The business was in a poor condition to endure further financial reverses, even without the suspension, and the record reasonably shows that even before suspension the business had not been the success Vandervelde had hoped.

The evasiveness and lack of credibility of Vandervelde as a witness are of no aid to plaintiffs in this connection or generally.

In a private treble damage action "the trier of the facts may make a just and reasonable estimate based on relevant data and may act upon probable and inferential as well as direct and positive proof" in assessing damages. Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 358 F.2d 790, 793 (6th Cir. 1966); *cf.* Eastern Fireproofing Co., Inc. v. U. S. Gypsum Co., 970 Trade Cas. (CCH), ¶ 73, 342 at 89, 365 (D.Mass.

1970). The companies suing here were deprived of a loss of profits while they continued in business and their good-will value when the business was terminated. Calculation of these amounts provides full relief for the corporate plaintiffs. Although the calculation of going concern value "obviously involve[s] an element of speculation," the detailed picture of the business presented by Topper and Sommer provides data on which a "rationally-based quantification" may be made. *Farmington Dowel Products Co., supra* 421 F.2d at 81. *See also,* Note, 80 Harv.L.Rev. 1566, 1581 (1967).

■■ When a plaintiff claims damages for total destruction of his business his recovery is bounded by "the only value which his business had before it was closed which it did not have afterwards . . . its 'going concern' or good will value." Standard Oil Co. of California v. Moore, 251 F.2d 188, 219 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958) (destruction of retail gasoline business).

The Ninth Circuit defined the elements which go into calculation of the "good will" of such a business as: "(1) What profit has the business made over and above an amount fairly attributable to the return on the capital investment and to the labor of the owner?; (2) What is the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the valuation?" Standard Oil Co. of California v. Moore, 251 F.2d at 219; Simpson v. Union Oil Co. of California, 411 F.2d 897, 909 (9th Cir.), rev'd on other grounds, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); Central Coal and Coke Co. v. Hartman, 111 F. 96, 98–99 (8th Cir. 1901).

■■ A deduction for the amount which the capital invested in the corporate plaintiffs would otherwise earn is necessary in order to limit the recovery to the loss which they realistically suffered. The value of their business is measured by the amount of income that business would produce in excess of the income which could otherwise be generated by their capital if devoted to other income-earning uses. Standard Oil Co. of California v. Moore, *supra; cf.* Albrecht v. Herald Co., 452 F.2d 124 (8th Cir. 1971).

■■ This Court may take judicial notice of the interest rates on savings deposits and United States Treasury obligations as of September 30, 1963. United States v. Guaranty Trust Co. of New York, 60 F.Supp. 103, 106 (S.D.N.Y. 1945), modified, 161 F.2d 571 (2d Cir. 1947), cert. denied, 332 U.S. 807, 68 S.Ct. 106, 92 L.Ed. 385 (1947). As of that date it appears from the records of the Federal Reserve System that time deposits in commercial banks earned 4% per annum and that ninety day Treasury Notes produced an interest rate of approximately 3.5%. On the same date, the Vandervelde corporations possessed a capital of $108,000, composed primarily of cash, receivables and securities held at inventory. Under the facts and circumstances of this case, the Court finds that $4,050 represents that portion of the business' net earnings which are fairly attributable to a reasonable return on the corporate capital, and that $3,790 represents the portion of earnings attributable to the corporate value as a going concern.

■■ Determination of the going concern value of the Vandervelde commission business is dependent upon calculation of the multiple of this $3,790 of earnings which a willing buyer might have paid Vandervelde for the enterprise, i. e., the capitalized value of this earnings stream.

■■ "[T]he price which men will pay for [a business] will depend on the relative certainty with which [the] earnings can be counted upon to continue." 1 Dewing, Financial Policy of Corporations 288 (5th Ed. 1953). Key factors in assessing the stability of an earnings stream include the past history of the business, the economic outlook in general, the outlook of the specific industry involved, and, most centrally, the prospects that the business will be able to

continue to participate in the industry to the same extent as previously. The last calculation is especially a matter of judgment. *See* Kimball Laundry Co. v. United States, 338 U.S. 1, 16–17, and 17 n. 9, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). Thus, Dewing stresses that "the rate at which a business shall be capitalized, to obtain its value, will depend on the confidence the buyer may feel in the continuation of the earnings. This is the relative risk of the business itself. The greater the risk, the greater the doubt of continued earnings, the lower is the capitalized value of these earnings . . ." Calculation of the influence of the risk factor includes assessment of the relative importance of management factors in a business' profitability, the influence on the business' prospects of fluctuations in business conditions generally and in the industry involved, and the "uncertainties of trade customs." Dewing, *supra*, at 288; Campbell v. American Fabrics Co., 168 F.2d 959, 962 (2d Cir. 1948).

 Dewing suggests that industrial businesses which depend on the special or unusual skill of their managers in a highly competitive industry are appropriately valued at twice the earnings stream, while personal service businesses whose earnings reflect the special skill of their managers may be valued at only the value of a single year's average earnings. *Id.* at 391. While later commentators and Courts have noted a need to update the Dewing projections to take account of more modern business conditions, see Graham, Dodd & Cottle, Security Analysis 513 (4th Ed. 1962); *cf.* Marks v. Wolfson, 41 Del.Ch. 115, 188 A.2d 680, 686 n. 7 (1963), the final selection of an appropriate ratio rests on the appraiser's judgment as to the specifics of the enterprise to be valued and each case of valuation must ultimately rest on its own facts.

 Plaintiffs argue that an appropriate multiplier would be twenty times earnings, based on the fact that the shares of Lawrence Kotkin Associates—put and call dealers—were sold to the public at approximately that ratio to Kotkin's earnings in 1969. However, there was little evidence that Vandervelde's business was even remotely comparable to Kotkin's. Kotkin's capital was at least three times as great as Vandervelde's, the business had a six year history of gross commission revenue which in the years preceding the ones here in issue was from two to six times as great as Vandervelde's and had net earnings after taxes far above the yearly earnings of Vandervelde from the commission business. Moreover, the fact that untutored speculators in cheap stocks may purchase shares like the Kotkin shares at such a ratio does not provide a basis for assuming that a knowledgeable party interested in entering the put and call business as an occupation would be subject to similar impulses. While not conclusive, it is interesting to note that the market price of the Kotkin shares plummeted from an offering price of $9.00 per share in June, 1969 to approximately $.50 per share within a comparatively brief period. This fact at least reflects the inherent risks of investment in any business whose fortunes are dependent upon the speculative skills of its managers concerning a highly volatile and specialized segment of the securities industry.

Moreover, Vandervelde's own history contained elements which would put a prospective buyer on his guard. The business' San Francisco office had been closed, and while Vandervelde testified that the closing was merely due to a decision to concentrate in New York and Los Angeles, there is evidence that the San Francisco office was economically unprofitable. The 1962–63 decline was not entirely due to external factors as Vandervelde's decreased market share indicates. Vandervelde's clientele was limited and dependent upon his ability to develop and maintain working relationships with the brokerage houses which had dealings with him. The firm was not one of the major put and call houses and this factor was the element providing special significance to the loss of patronage of Bache, duPont and the other

firms with which Vandervelde had been developing contacts and whose cessation of dealings forced the decision to end operations. Even without the suspension, the standing of a small firm in the option industry rested on a number of inherently variable elements, especially the ability to continue to bid effectively for buyers and sellers, and to quote prices which managed to be high enough to attract writers' business while allowing a markup on resale necessary to maintain a significant profit margin. See SEC 1961 Report at 91, 88–94. While the earnings history indicates that Vandervelde was successful in maintaining these contacts and speculating successfully on the prices at which options could be bought and resold, the ability to continue to do so could not be firmly forecast, since it depended on competition from other sources and, to some degree, on the personal relationship between Vandervelde and brokerage house personnel who represented buyers and sellers of options. The stock market break indicated how unstable the earnings prospects of the most stable option houses were.

 For all of these reasons, an appropriate capitalization rate for this business, in the circumstances in which it found itself at the date of the suspension would be in a range of approximately three to four times earnings in terms of estimating the value of the business to Vandervelde. Sommer was of the opinion that the multiplier should be reduced by about one-third if the valuation were made for an outside purchaser. Thus, a valuation of the goodwill of Vandervelde's commission business at a three times multiple of the portion of net earnings attributable to goodwill, or a total of $11,370, is, in the Court's determination, a fair value for that goodwill.

 The amount which Vandervelde lost prior to cessation of his business is a separate component of his recovery, as indicated above. Although operations continued in September and October, 1963, the business has been valued as of the end of September because of the paucity of accounting data for the month of October and the fact that the expert testimony as to valuation was based on earnings figures up to the end of September. Since a recovery of lost profits after the date of valuation in addition to the value of the business destroyed constitutes a double recovery, Albrecht v. Herald Co., 452 F.2d 124 (8th Cir. 1971), Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61, 81–82 (1st Cir. 1970), Vandervelde is entitled to recover lost profits for the period August 27, 1963 to September 30, 1963.

 The elements of the lost profits computation are slightly different than those used to compute average annual earnings. Cohen's imputed salary need not be taken to increase the loss otherwise incurred since no funds were paid for his services. Because the inquiry is the amount Vandervelde actually lost, rather than the earnings an independent purchaser of his business would reasonably project, no further downward adjustment for the differentiation between self-generated and purchased options need be made.

 The commission operation lost approximately $6,100 in September, 1963. The business' average commission earnings for the entire four years of their business were approximately $2,300 per month. The business' average monthly losses during the first eleven months of its 1963 fiscal year, prior to the suspension, were approximately $1,850 per month, but, as discussed above, the operation earned approximately $3,943 per month during the summer months of 1963, offsetting its earlier losses. Defendants' own acts caused the uncertainty inherent in projecting the amount the business would have been able to earn, absent the suspension, in September, 1963. Under the circumstances, the Court finds that the commission business lost approximately $9,500 worth of sales and cash-in proceeds which it would otherwise have earned during that month, although $6,100 of that amount would have reduced the net loss which otherwise occurred. The fact that restoration of lost sales would only reduce a deficit

from operations does not bar recovery of those earnings. *Cf.* Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080, 1086 (7th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971). There is no detailed proof as to the effect of the suspension on dealings in the last days of August, 1963, but the $9,500 figure is sufficient to cover any lost profits for that period as well.

*The Assessable Damage—*
 *Individual Plaintiff*

Vandervelde seeks to recover as an individual plaintiff the salary which he lost in his capacity of president of the plaintiff corporation. Defendants contend, however, that he lacks standing to recover compensation for such an injury under the antitrust laws, 15 U.S.C. § 15.

Until the last decade, Courts denied standing to employees seeking to recover salary lost when their employers' business was injured by an antitrust violation. *See* Congress Building Corp. v. Loew's, Inc., 246 F.2d 587, 590 (7th Cir. 1957); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678, 679 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L. Ed. 687 (1952); Walder v. Paramount Publix Corp., 132 F.Supp. 912, 916 (S.D. N.Y.1955); Gerli v. Silk Association of America, 36 F.2d 959 (S.D.N.Y.1929). The reasoning in each of those cases was that the injury claimed by the employee was at best collateral to the claimed antitrust violation. *Cf.* SCM Corp. v. Radio Corp. of America, 407 F. 2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969).

However, more recent decisions have accorded an employee standing to prove, if he can, that his loss of salary or the other prerequisites of employment was a sufficiently foreseeable consequence of a violation to render the connection between the wrong and the injury direct.

Dailey v. Quality School Plan, 380 F.2d 484 (5th Cir. 1967); Isidor Weinstein Investment Co. v. Hearst Corp., 303 F. Supp. 646 (N.D.Cal.1969); Schroeter v. Ralph Wilson Plastics, Inc., 49 F.R.D. 323 (S.D.N.Y.1969); Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (1967). *Cf.* Perkins v. Standard Oil Co. of California, 395 U.S. 642, 649–650, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (1969) (owner of failing corporations who claimed recovery for financial losses suffered as individual "was no mere innocent bystander; he was the principal victim of the price discrimination practiced by Standard. Since he was directly injured and was clearly entitled to bring this suit, he was entitled to present evidence of all of his losses to the jury."); Schulman v. Burlington Industries, Inc., 255 F.Supp. 847, 851 (S.D.N.Y.1966). *But see* Deaktor v. Fox Grocery Co., 332 F. Supp. 536 (W.D.Pa.1971).

The general test in this Circuit for determining standing to sue in antitrust actions is whether plaintiff is able to allege (and prove) "a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendants' illegal act." Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). The *Baxter* decision explained that two criteria for applying these "talismanic guides" in specific cases are the "form of violation alleged and the nature of its effect on plaintiff's own business activities." *Id.*

Applying these standards to the record in this case, Vandervelde must be accorded standing to recover his individual loss as an employee of the defunct corporations. The action challenged in this suit is the suspension of Vandervelde himself from membership in the Association because of his decision to refuse to abide by an Association rule. That suspension denied the corporations of which Vandervelde was sole owner the privileges of "associated membership", most im-

portantly the use of the Association option form.

▆ The Association's membership is made up of the principals of the various option firms and it is the status of the principals as members of the Association which enables their firms to participate in the option business under the Association's aegis. Accordingly, the imposition of sanctions against members is both a personal and a firm sanction. When the Association imposed its sanction, Vandervelde's own status was "aimed at" and the competitive restriction of the boycott was principally directed at Vandervelde himself. The injury to Vandervelde's prospects in the option business, whether as principal of the corporate plaintiffs or as their chief salaried employee, was well within the foreseeable area of impact of the suspension. Isidor Weinstein Investment Co. v. Hearst Corp., 303 F.Supp. 646, at 649–650 (N.D.Cal. 1969); Perkins v. Standard Oil Co. of California, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

There is another reason why Vandervelde cannot be denied standing on the ground that his claim is merely derivative. In reality Vandervelde's salary was a cash draw which he varied, as sole owner, according to the business' financial situation. The cost of Vandervelde's services was a direct charge against earnings and was deducted wholly from commission earnings in computing the profitability of the broker-dealer operation. While it would be possible to obtain a picture of the loss Vandervelde suffered by adding his salary-draw back into the corporate earnings figures, consonant with the reality that the amount of the return was within Vandervelde's sole discretion as to whether to withdraw or in effect re-invest part of his salary-draw, such a procedure would overstate the earnings stream for a prospective purchaser who would have to pay someone for a manager's services, unless he chose to operate the business himself, as Vandervelde had. However, to charge salary against corporate earnings, while denying a plaintiff in Vandervelde's posi-

tion standing to recover a figure representing salary lost, would understate the loss incurred when the coporations ceased business.

The amount of recovery to which Vandervelde is entitled for salary losses is not easy to ascertain. His average salary during the last three years of operations was $16,000, although he drew $12,000 from salary, according to Sommer's testimony, in the 1964 fiscal year, and although the business operated for only one month during that year.

▆ There is no indication that Vandervelde's salary would have continued at any fixed level and it would most likely have continued to fluctuate according to variations in the business' fortunes. Moreover, the period for which Vandervelde would have chosen to remain in business absent the suspension cannot be reasonably estimated. Under these circumstances, an award of one year's average salary, $16,000, is fair compensation for the loss incurred.

*Defendants Liable*

The remaining issue is which of the defendants are liable for the injuries to plaintiffs. The three classes of defendants as to whom this determination must be made are the Association itself, the individual members of the Association, and the put and call firms of which these members were the principals at the time the suspension was imposed.

▆ Liability depends upon knowing participation in or acceptance of a common plan to enforce the discount rule against Vandervelde. Hoffman v. Herdman's Ltd., 41 F.R.D. 275, 277–278 (S.D.N.Y.1966). The evidence must show that defendants had committed themselves to a common plan or acted knowingly to further the objects of that plan; but a prior agreement among or simultaneous action by conspirators is not necessary. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Courts have commented with respect to antitrust conspiracies that once the conspiracy itself has been established only "slight

evidence" is necessary to connect individual defendants with it. Riss & Co. v. Ass'n of American Railroads, 187 F. Supp. 306, 313 (D.D.C.1960), rev'd on other grounds, 299 F.2d 133 (D.C.Cir.), cert. denied, 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); United States v. Morgan, 118 F.Supp. 621, 743–744 (S.D. N.Y.1953).

 Mere membership in an Association is insufficient without more to justify a finding of liability. Phelps Dodge Refining Corp. v. Federal Trade Commission, 139 F.2d 393, 396 (2d Cir. 1943); see also Household Goods Carriers' Bureau v. Terrell, 417 F.2d 47, 54 (5th Cir. 1969); Northern California Pharmaceutical Ass'n v. United States, 306 F.2d 379, 388–389 (9th Cir.), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962); Knauer v. United States, 237 F. 8, 19–20 (8th Cir. 1916). Similarly, mere membership on a committee is not in itself sufficient proof of connection or ratification. Metropolitan Bag & Paper Distributors Ass'n v. Federal Trade Commission, infra; cf. Cape Cod Food Products v. National Cranberry Ass'n, 119 F.Supp. 900, 919 (D.Mass.1954).

 On the other hand, where a member knows or should know that the Association to which he belongs is engaged in an unlawful enterprise and he continues his membership without protest, he may be found to have ratified the organization's action and become unable subsequently to disassociate himself from responsibility for its results. Phelps Dodge Refining Corp. v. Federal Trade Commission, supra; see also Northern California Pharmaceutical Ass'n v. United States, supra; Metropolitan Bag & Paper Distributors Ass'n v. Federal Trade Commission, 240 F.2d 341, 344–346 (2d Cir.), cert. denied, 355 U.S. 819, 78 S.Ct. 24, 2 L.Ed.2d 35 (1957); Riss & Co. v. Ass'n of American Railroads, supra, 187 F.Supp. at 312; Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 155 F. Supp. 768, 829 (E.D.Pa.1957), aff'd, 273 F.2d 218 (3d Cir. 1959), rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Vandervelde v. Put and Call Brokers and Dealers Ass'n, 43 F.R.D. 14, 17 (S.D.N.Y.1967). The key element of proof for linking an Association member to the acts of his organization is a showing that he knew of and condoned the act in issue.

The co-conspirators here are the Association itself and those of its officers, directors, committeemen and members who knowingly initiated, participated in, or sanctioned the disciplinary action taken against Vandervelde.

██ The Association itself is liable as an independent legal entity, whether it is viewed as having conspired with Filer Schmidt & Co. to suspend Vandervelde or whether it is viewed as the continuing mechanism through which members conspired to enforce against a recalcitrant competitor a restrictive pricing regulation. Northern California Pharmaceutical Association v. United States, supra. Cf. United States v. Topco Associates, Inc., 405 U.S. 596, 601, 92 S.Ct. 1126, 1130, 31 L.Ed.2d 515 (1972).

██ The liability of those defendants (Blair, Botts, Godnick, Lerner, Harnden and Linburn) who recommended or ordered the fine and subsequent suspension is clear. Each participated directly in the actions which furthered the object and result of the conspiracy. Hartford-Empire Co. v. United States, 323 U.S. 386, 403–406, 65 S.Ct. 373, 89 L.Ed. 322 (1945); Phelps Dodge Corp. v. Federal Trade Commission, supra, 139 F.2d at 397; Bergjans Farm Dairy Co. v. Sanitary Milk Producers, 241 F.Supp. 476, 482–483 (E.D.Mo.1965), aff'd, 368 F.2d 679 (8th Cir. 1966); cf. Faulk v. Milton, 25 App.Div.2d 314, 316, 268 N.Y.S.2d 844 (1st Dept.1966), aff'd mem., 20 N.Y.2d 894, 285 N.Y.S.2d 864, 232 N.E.2d 860 (1967).

██ The defendant Herbert Filer, who initiated the complaint is equally liable; his liability is not reduced by the fact that he refrained from participation in Board discussions of the Vandervelde controversy. Feldman v. North British

& Mercantile Ins. Co., 137 F.2d 266, 268 (4th Cir. 1943) ("Liability of a member may exist without personal participation in the unlawful act of a voluntary association if the members sets the proceedings in motion or agrees to a course of action which culminates in wrongful conduct.").

█ The defendants Alvin Filer and Ivers filed complaints against Vandervelde for failure to sell advertised options at a discount during the summer of 1963 albeit these complaints became moot when the suspension occurred. They are liable.

█ The four remaining individual defendants, Balson, Friedman, Haab, and Krinski were not directly involved in the deliberations which led to the suspension. Balson was a member of the Business Conduct Committee but did not participate in its recommendation. Friedman was a principal in Godnick & Son, and Krinski was a past Director of the Association, but apart from membership in the Association there is little mention of either of them at any point in the voluminous record. Haab admitted informing callers of the suspension and its effect on Vandervelde's status.

Thus, as to the defendants Haab, Balson, Friedman and Krinski the complaint is dismissed.

The put and call firms named as defendants are Henry Blair & Co., Inc., Alvin Filer & Co., Inc., Godnick & Son, Inc.; Cohn, Ivers & Co., Inc.; Saul Lerner Co., Inc.; Thomas, Haab & Botts; Filer, Schmidt & Co.; and Irving E. Krinski & Co. The last three firms are apparently partnerships. While these firms are commonly referred to as "member firms" of the Put and Call Brokers and Dealers Association and their option forms and advertisements contain a legend to this effect, as does the material published by the Association itself, each firm's status is that of associated membership dependent upon the actual membership of the principal of the firm.

█ Each of the individual defendants liable was a principal of one of the broker-dealer defendants with the exception of Harnden and Linburn who were the president and secretary of the Association, respectively, and members of stock brokerage firms. The evidence clearly indicates that the activities of the individual defendants in the management of the Association were well within the scope of their authority from the firms they represented; indeed in most cases the firms were dominated by these individuals and they managed the Association as well. Cf. United States v. New York Great Atlantic & Pacific Tea Co., 173 F.2d 79, 88 (7th Cir. 1949). While it may be true that authority to commit tortious acts is not lightly assumed, United States v. Ward Baking Co., 243 F.Supp. 713, 718 (E.D.Pa.1965), the nature of the relationship between the firms and the Association justifies a finding that the participation of option brokers and dealers in the activities of the Association was an integral part of their employment in the industry. Moreover, the firms had a direct interest in the subject matter of the Vandervelde controversy.

The Court concludes that the conduct of the individual defendants found liable is properly imputed to the broker-dealer defendant firms. Cf. Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, supra, 155 F.Supp. at 829–832.

█ The evidence as to Krinski & Co., however, is insufficient to justify a finding of liability. Krinski played no direct or indirect role in the Vandervelde controversy and the firm itself, under these circumstances, has not been shown to have any connection to the matters at issue except that of a "mere member". The complaint is dismissed as to Krinski & Co.

The single damages of the corporate plaintiffs are found to amount to $20,870 and the single damages of the individual plaintiff are found to amount to $16,000.

█ Under the statute, 15 U.S.C. § 15, the plaintiffs are entitled to have the damages trebled as against the defendants other than the defendant Es-

tates, which are held liable only for single damages and a judgment is ordered accordingly. Rogers v. Douglas Tobacco Board of Trade, 244 F.2d 471, 483 (5th Cir. 1957); Sullivan v. Associated Billposters and Distributors, 6 F.2d 1000, 1012 (2d Cir. 1925); *cf.* Banana Distributors, Inc. v. United Fruit Co., 27 F.R.D. 403, 415 (S.D.N.Y.1961).

No prejudgment (moratory) interest is allowed. Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 80 (2d Cir. 1971), cert. granted 405 U.S. 915, 92 S.Ct. 960, 30 L.Ed.2d 785 (1972).

Allowances to plaintiffs' counsel will be fixed and determined upon appropriate application therefor and will be added to the foot of the judgment as directed by the Court.

Plaintiffs shall recover one bill of costs against all the defendants found liable, to be taxed by the Clerk.

The foregoing shall constitute the findings and conclusions required by Fed.R.Civ.P. 52(a).

Settle judgment in accordance with Rule 54(a), Fed.R.Civ.P., on five days notice returnable within fourteen days hereof.

So ordered.